**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | |
|---|---|
| JEAN W.[1] O/B/O WILLIAM W., DECEASED, ) ) **Plaintiff,** ) ) v. ) ) KILOLO KIJAKAZI, ) **Acting Commissioner of Social Security,** ) ) ) **Defendant.** ) | Civil Action No. 7:21cv00512 |

**REPORT AND RECOMMENDATION**

Plaintiff Jean W. ("Sandra") filed this action on behalf of her deceased spouse, William W. ("William"), challenging the final decision of the Commissioner of Social Security ("Commissioner") finding William not disabled and therefore ineligible for disability insurance benefits ("DIB") under the Social Security Act ("Act"). 42 U.S.C. §§ 401–433. Jean alleges that the Administrative Law Judge ("ALJ") erred in: (1) finding William's mental impairments non-severe; (2) finding that William could perform his past relevant work; and (3) assessing William's allegations regarding his symptoms.

I conclude that substantial evidence supports the Commissioner's decision in all respects. Accordingly, I **RECOMMEND GRANTING** the Commissioner's Motion for Summary Judgment (Dkt. 15) and **DENYING** William's Motion for Summary Judgment (Dkt. 13).

**STANDARD OF REVIEW**

---

[1] Due to privacy concerns, I use only the first name and last initial of the claimant in social security opinions.

This court limits its review to a determination of whether substantial evidence exists to support the Commissioner's conclusion that William failed to demonstrate that he was disabled under the Act.[2] Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (internal citations and alterations omitted); see also Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (emphasizing that the standard for substantial evidence "is not high"). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Mastro, 270 F.3d at 176 (quoting Craig v. Chater, 76 F.3d at 589). Nevertheless, the court "must not abdicate [its] traditional functions," and it "cannot escape [its] duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). The final decision of the Commissioner will be affirmed where substantial evidence supports the decision. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

## CLAIM HISTORY

William filed for DIB in July 2019, claiming that his disability began on January 1, 2008, due to stage 4 liver disease, kidney failure, liver failure, back injuries, arthritis, anxiety, insomnia, and high blood pressure. R. 22, 94, 253. William's date last insured is March 31, 2016;

---

[2] The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Disability under the Act requires showing more than the fact that the claimant suffers from an impairment which affects his ability to perform daily activities or certain forms of work. Rather, a claimant must show that his impairments prevent him from engaging in all forms of substantial gainful employment given his age, education, and work experience. See 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

2

thus, he must show that his disability began on or before this date and existed for twelve continuous months to receive DIB. R. 23; 42 U.S.C. §§ 423(a)(1)(A), (c)(1)(B), (d)(1)(A); 20 C.F.R. §§ 404.101(a), 404.131(a). The state agency denied William's application at the initial and reconsideration levels of administrative review.[3] R. 94–111. William died[4] prior to the hearing with ALJ Michael Dennard to consider his claim for DIB, which occurred on September 23, 2020. R. 43–93. Jean, his widow, was substituted as a party and testified at the hearing, where she was represented by counsel, and which also included testimony from vocational expert Gerald Wells. R. 141. On December 4, 2020, the ALJ entered his decision analyzing William's claims under the familiar five-step process[5] and denying the claim for benefits. R. 22–37.

The ALJ found that William was insured at the time of the alleged onset and that he suffered from the severe impairments of cervical and lumbar spine degenerative disc disease, left shoulder rotator cuff injury, subacromial impingement, and brachial plexopathy. R. 25. The ALJ found that William's anxiety disorder and depressive disorder were non-severe impairments.[6] Id. Likewise, the ALJ found that William had no limitations in understanding, remembering, or

---

[3] William was 56 years old on his date last insured, making him a person of advanced age under the Act. R. 94.

[4] According to his Death Certificate, William died on August 27, 2019, of alcoholic hepatic cirrhosis. R. 1006.

[5] The five-step process to evaluate a disability claim requires the Commissioner to ask, in sequence, whether the claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Johnson v. Barnhart, 434 F.3d 650, 654 n.1 (4th Cir. 2005) (per curiam) (citing 20 C.F.R.§ 404.1520); Heckler v. Campbell, 461 U.S. 458, 460–62 (1983). The inquiry ceases if the Commissioner finds the claimant disabled at any step of the process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof at steps one through four to establish a prima facie case for disability. At the fifth step, the burden shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"), considering the claimant's age, education, work experience, and impairments, to perform available alternative work in the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

[6] The ALJ found other non-severe impairments of alcohol abuse and abnormal liver function and obesity. R. 25.

applying information, interacting with others, and adapting or managing oneself, and a mild limitation in concentrating, persisting, or maintaining pace. R. 26–27. The ALJ determined that these impairments, either individually or in combination, did not meet or equal a listed impairment. R. 28. The ALJ specifically considered listing 1.02 (major dysfunction of a joint) and listing 1.04 (disorders of the spine). Id.

The ALJ concluded that William retained the residual functional capacity ("RFC") through the date last insured to perform a limited range of light work. R. 29. Specifically, William could never reach overhead with his left upper extremity, climb ladders, ropes, or scaffolds, or work at unprotected heights or around hazardous machinery. Id. He could frequently reach in directions other than overhead with the left upper extremity and could frequently climb ramps and stairs, balance, stoop, kneel, crouch and crawl. Id. The ALJ determined that William was able to perform his past relevant work as a sales representative and construction estimator, a composite job. R. 34–35. Alternatively, the ALJ determined that William could perform other jobs that exist in the national economy, such as office helper, mailroom clerk, and store clerk. R. 36. Thus, the ALJ determined that William was not disabled through the date last insured of March 31, 2016. R. 36–37. Jean appealed the ALJ's decision on William's behalf, and the Appeal's Council denied her request for review on August 9, 2021. R. 1–4.

## ANALYSIS

Jean alleges that the ALJ erred by finding William's mental impairments non-severe, by finding that he could perform his past relevant work, and in assessing his allegations regarding his symptoms.

### A. Medical History Overview

1. Medical Treatment

William injured his neck and left arm in an accident at work in 2005, several years prior to the alleged onset date in 2008. R. 1108. In 2008, an x-ray of his left shoulder was "unremarkable" while an x-ray of his spine showed mild degenerative changes. R. 1000-01. William underwent left shoulder surgery for scapular muscle reattachment in January 2009 and he reported improvement at follow-up appointments and in physical therapy. R. 1111–17, 791. However, by July 2009, William reported increased pain and difficulty reaching, and in January 2011, he began treating at a pain management clinic. R. 789, 1117, 1220, 1222-23. An x-ray in October 2011 showed mild degenerative changes, with mild to moderate facet degenerative changes in the lower lumbar spine. R. 1366. Following increased complaints of pain, he had a nerve block injection in May 2012, and underwent subsequent injections through 2015. R. 1226, 1228. In November 2013, Sander W. Leivy, M.D. performed an Independent Medical Evaluation. R. 1208–19. Dr. Leivy's impression was a left shoulder injury due to William's 2005 work injury and left brachial plexopathy from thoracic outlet syndrome secondary to this same injury. In November 2014, William, complaining of a "shooting sensation" down his left arm, was evaluated for thoracic outlet syndrome, with the impression that his symptoms suggested impingement syndrome instead of thoracic outlet syndrome. R. 740–41. An x-ray of his lumbar spine in May 2016, shortly after his date last insured, showed grade 1 anterolistheis at one level with no instability and mild degenerative changes. R. 981.

Regarding his mental health treatment, William had regular counseling sessions with his psychologist during the relevant period, beginning in October 2009. R. 1009-1012. During these sessions, William complained of depression and anxiety, and the sessions often focused on

5

coping with his pain and medical problems, as well as anger and frustration, with generally fair/variable functioning reported. R. 1013–1101.

2. Medical Opinions

In March 2020, state agency physician Michael Koch, M.D. reviewed the record and found William capable of a limited range of medium work, while also noting that "the evidence is not sufficient to fully determine his functioning at the date last insured." R. 110. The ALJ found this opinion not persuasive, as the evidence supported a limitation to light work. R. 33.[7] State agency psychologist Richard J. Milan, Jr. Ph.D. also reviewed the record in 2020, finding William's anxiety and obsessive-compulsive disorders non-severe and that there was insufficient evidence to evaluate his mental state for the relevant period. R. 107–08.

B. Mental Impairments

Jean argues that the ALJ failed to properly evaluate William's mental impairments by finding them non-severe at Step Two of the sequential evaluation. In support, Jean cites to treatment records where she states William's counselor, Dr. Heil, indicated an "impact of [his anxiety disorder and depressive disorder] on William's functioning." Pl.'s Br. at 25, Dkt. 14. Jean also argues that William's failure to report depressive and anxiety symptoms to his primary care provider does not necessarily support the ALJ's conclusion that these were non-severe impairments, especially because the ALJ ignored his "consistent complaints of symptoms" to his pain doctor and orthopedist. Pl.'s Br. at 26, Dkt. 14.

An impairment is non-severe when it causes no significant limitations in the claimant's ability to work. 20 C.F.R. §§ 404.1521(a), 416.921(a). "[A]n impairment can be considered as

---

[7] In January 2020, state agency physician Joseph Familant, M.D. reviewed the record and found insufficient evidence to evaluate the claim. R. 98-100. The ALJ also found this opinion not persuasive. R. 33.

6

'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984)). Additionally, an impairment must last, or be expected to last for a continuous period of at least 12 months to be considered "severe." 20 C.F.R. §§ 404.1509, 404.1520(a)(4)(ii). Jean bears the burden of proving that William's anxiety and depression are severe impairments. Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (stating that the claimant bears the burden of showing that he has a "severe" impairment).

When evaluating mental impairments, the Regulations require the ALJ to use a special technique to rate a claimant's degree of limitation in each of the functional areas based on the extent to which a plaintiff's impairment "interferes with the [] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). The four functional areas include: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace, and (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(A)(2)(b), § 12.04(B). A rating of "none" or "mild" generally calls for a conclusion that the impairments are not severe unless the evidence indicates more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § § 404.1520a(d)(1), 416.920a(d)(l). If the ALJ determines that the claimant does not have a severe impairment or combination of impairments, a finding of not disabled is made at step two, and the sequential process comes to an end. On the other hand, if the claimant has at least one impairment that is deemed severe, the process moves on to the third step.

Here, the ALJ found that William's "medically determinable mental impairments of anxiety disorder and depressive disorder, considered singly and in combination, did not cause more than minimal limitation in [his] ability to perform basic mental work activities and were therefore nonsevere." R. 25. The ALJ found no limitation in three functional areas, and a mild limitation in one. The ALJ found no limitations in the functional areas of understanding, remembering, or applying information, interacting with others, and adapting or managing oneself, and a mild limitation in concentrating, persisting, or maintaining pace. R. 27. In understanding, remembering, or applying information, the ALJ noted that the medical evidence, including mental status reports, generally showed no deficits in memory, insight, or judgment, nor did William complain of symptoms in these areas, with the exception of a single counseling session. R. 26–27. In interacting with others, the ALJ wrote that William "interacted normally with all treating practitioners," went out in public, socialized with family, and lived with his wife "without serious problems." R. 27. In finding a mild limitation in concentrating, persisting, or maintaining pace, the ALJ noted that he did not generally complain of symptoms related to this domain at appointments, and while he alleged poor concentration at a single counseling appointment, the psychologist noted his concentration as intact. R. 27. In adapting or managing oneself, William likewise did not complain of problems to his practitioners who generally noted no hygiene or clothing deficiencies, and William handled his own activities of daily living. R. 28. The ALJ also recorded that William never took psychiatric medications. R. 27. Overall, because William's medical determinable mental impairments caused no more than mild limitations in any of the functional areas and the evidence does not otherwise indicate a more than minimal limitation in Williams's ability to do basic work activities, the ALJ found his mental impairments non-severe. R. 28; see also 20 C.F.R. § § 404.1520a(d)(1) (stating that a

rating of "none" or "mild" generally calls for a conclusion that the impairments are not severe unless the evidence indicates more than a minimal limitation in the claimant's ability to do basic work activities).

Contrary to Jean's argument, the ALJ adequately discussed William's treatment with Dr. Heil, and did not ignore William's symptoms, including depression and anxiety. As the Commissioner points out, there is no requirement that the ALJ "explicitly discuss[] every medical appointment." D.'s Br. at 12. The ALJ noted that William initially saw Dr. Heil in 2009, related to his worker's compensation claim, with the main complaints of depression and anxiety "related to his physical pain and limitations." R. 26. The ALJ acknowledged William's good participation in both group and individual therapy, with a focus on helping William cope with his pain, stress, and depression, but an absence of objective mental status findings. Id. Likewise, contrary to Jean's argument, the ALJ accurately summarized his mental complaints to his primary care doctor, as follows:

> [William] generally did not complain of active depression or anxiety symptoms [to his primary care doctor]. Many appointments show he denied any psychological symptoms, but sometimes depression and anxiety were highlighted in the review of symptoms, though he did not make any specific complaints about them. He had normal brief mental status findings at many follow-ups [and] did not take any psychiatric medications.

R. 26.

The ALJ's assessment of non-severe mental impairments is also consistent with the conclusion of state agency psychologist Dr. Milan, Jr. who found William's anxiety and obsessive-compulsive disorders non-severe. R. 107–08. Jean does not identify any medical opinion finding additional mental limitations; instead, Jean points to evidence the ALJ already considered, and asks the court to use it to reach a different conclusion. However, I find that substantial evidence supports the ALJ's conclusion that William's mental impairments were non-

9

severe and that William was capable of performing work at the level stated in the ALJ's opinion through the date last insured.

### C. Past Relevant Work

Jean argues that the ALJ erred by finding that William could perform his past relevant work as a sales representative and construction estimator composite job. In support, Jean contends that, "William did not exactly perform the composite job outlined by the vocational expert." Pl.'s Br. at 28, Dkt. 14.

In most cases, a claimant will be found not disabled at step four of the five-step disability determination if he maintains the RFC to perform his past relevant work, either as actually performed or as it is generally performed in the national economy. Social Security Ruling (SSR) 82–61, 1982 WL 31387, at *2 (1982); see also 20 C.F.R. §§ 404.1560(b), 416.960(b). The Commissioner will then use the job descriptions appearing in the Dictionary of Occupational Titles to determine how a job is usually performed in the national economy. SSR 82–61, 1982 WL 13187, at *1–*2. However, composite jobs, "have significant elements of two or more occupations and, as such, have no counterpart in the DOT." Id. Because of this, when a claimant's past relevant work is considered a composite job, the claimant's ability to perform it must be "evaluated according to the particular facts of each individual case." Id. Likewise, in determining whether a claimant's past relevant work was a composite job, the ALJ must explain his reasoning. Shealy v. Colvin, No. 8:13-2383-RMG, 2015 WL 467726, at *12 (D.S.C. Feb. 4, 2015) (finding "that the ALJ failed to properly explain his reasoning for finding the job of 'order clerk' to be past relevant work for plaintiff as opposed to finding it to be part of a composite job.") The ALJ can "find the plaintiff capable of performing the composite job only if he or she can perform all parts of the job as it was actually performed." Taylor v. Colvin, No. 1:14CV629,

2015 WL 4726906, at *4 (M.D.N.C. Aug. 10, 2015) (unreported) (citation and quotations omitted).

Here, the ALJ found that William's work as a sales representative and construction estimator is a composite job because it has significant elements of more than one DOT occupation. The ALJ referenced the vocational expert's testimony that William could perform "his past composite job as actually performed . . . based on [Jean's] description of his past work." R. 35. At the hearing, the ALJ questioned Jean about William's past relevant work. Regarding his time at Thermosteel Corporation, Jean testified, "based on his resume. I did not know [William] at that time. But . . . his basic job – he did a lot of different things, but they all related to the construction industry. Or say – and /or sales." R. 56. Regarding his time at Warsaw Home Incorporated, from 2004 to 2007, Jean testified, "I believe his job was in construction sales, and he was on the road a lot." R. 57. The ALJ also discussed other positions William held with the vocational expert. R. 58–60. Regarding the Warsaw Home Improvement Job, the vocational expert, stated that, that work involved lumber supplies "and sales of lumber – but in other work –and I think that would be sales rep[resentative], because he indicated he was on the road a lot . . . So in other words, he estimated projects and that sort of thing . . . [a]s well as sold building supplies." R. 59–60.

The vocational expert then testified that William was a sales representative with building supplies and a construction estimator, explaining that "I looked at them as a composite job [because] they're interrelated . . . and I think he was doing both of them, you know, from time to time." R. 84. Contrary to Jean's argument, the vocational expert's statement does not mean that William actually performed these jobs "at different times for different companies" or that he "never actually performed" this composite job. Pl.'s Br. at 27–28. Instead, it means, as befitting a

11

composite job, that William's work had "significant elements of two or more occupations and, as such, have no counterpart in the DOT." SSR 82–61, 1982 WL 13187, at *2. The vocational expert further explained that the "cost estimating job" is not by itself a "single job [or] would not be a complete job." R. 88. Specifically, the "two or more occupations" were sales representative with building supplies (DOT 274.357.018) and construction estimator (DOT 169.267-038). The ALJ clarified that the composite job would be "light and skilled with an SVP 7."[8] R. 84. Here, the vocational expert explained why he identified a composite job, Jean did not object at the hearing, and the ALJ was entitled to rely on the vocational expert's testimony.

### D. Subjective Allegations

Jean argues that the ALJ's assessment of William's allegations is not supported by substantial evidence. Jean points to medical records where William rated his pain as 4, 5, or 6 out of 10, and where he complained of pain and other symptoms, as contradicting the ALJ's statement that Williams's symptoms were generally controlled and he "often described his pain as only 2 or 3/10 in severity." Pl.'s Br. at 29-30, Dkt. 14; R. 34. Jean also argues that the ALJ improperly relied on the daily activities William performed to discount his allegations, as they were not "performed on a sustained basis commiserate with substantial work activity." Pl.'s Br. at 32. The Commissioner counters that the ALJ adequately explained his reasoning for finding the evidence did not support William's allegations.

Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms. Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims, SSR 16-3P, 2017 WL 5180304 (S.S.A. Oct. 25, 2017); 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).

---

[8] As comparison, the vocational expert testified that sales representative with building supplies is a sedentary, skilled job with SVP 7, while construction estimator is a light, skilled job, with an SVP 7. R. 84.

First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms, such as pain.[9] Id. at *3, §§ 404.1529(b), 416.929(b). Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to work. Id. §§ 404.1529(c), 416.929(c). In making that determination, the ALJ must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." Id.

The ALJ's opinion includes a detailed discussion of William's medical treatment and the allegations of both William and Jean, and the ALJ explained his finding that these allegations were not entirely consistent with the medical evidence and other evidence in the record. Contrary to Jean's complaints that the ALJ ignored records where he complained of pain of higher than 3/10, the ALJ acknowledged that William's pain fluctuated. The ALJ wrote that, while William rated his pain as 2/10 at his medical evaluation in 2013, he also stated it was "worse on some days." R. 31. The ALJ noted that William saw his pain management doctor for treatment, including medication and injections in 2014, acknowledging that William "sometimes . . . reported worsening pain and rated it as 5/10 severity, but other times he reported the pain was

---

[9] SSR 16-3p states that a claimant must provide "objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce [the] alleged symptoms." Id. Objective medical evidence consists of medical signs ("anatomical, physiological, or psychological abnormalities established by medically acceptable clinical diagnostic techniques") and laboratory findings "shown by the use of medically acceptable laboratory diagnostic techniques." Id.

better." R. 32. The ALJ understood the nature and extent of William's treatment, and accommodated his pain symptoms in the RFC, explaining as follows:

> [William] underwent three surgeries in his left shoulder, but he reported improvement after his surgeries. He continued to complain of pain and limitation in the left shoulder, but he reported significant benefit from his treatment. He took routine medications and routinely underwent nerve block injections and reported these mostly relieved his pain. He often described his pain as only 2 or 3/10 in severity. These findings suggest [William] can perform frequent reaching, except for no overhead reaching, with his left upper extremity, and that he could lift and carry 10 pounds frequently and 20 pounds occasionally.

R. 34. The ALJ supported his findings regarding William's allegations, including by discussing his treatment in detail, his complaints to his providers, as well as the findings on exam and diagnostic findings. The ALJ noted that, since his surgeries, William's MRIs have "shown no significant abnormalities" but explained that because of tenderness to palpitation, and limited range of motion, especially overhead reaching, William has been limited to "only light lifting and carrying with no overhead reaching and only frequent reaching in other directions." R. 34.

The ALJ found that William's reported activities, including walking for exercise, lifting weights at the gym, cooking, household chores, and taking college classes all supported his ability to do "light lifting and frequent reaching and postural activities." R. 33. However, contrary to Jean's claim, the ALJ did not mischaracterize the extent to which William could perform his daily activities. Instead, the ALJ acknowledged Jean's testimony that William could not "sit constantly" but would have to move around and adjust, and that, while he could walk, or even sometimes run, he would have to sit down and take breaks due to pain. R. 30. The ALJ understood that while William could do "indoor chores," including dishes and sweeping, and he "loved to cook," these activities were not constant. R. 30, 70. Likewise, the ALJ acknowledged that Jean, who had known William since 2010, reported William had unpredictable, intermittent pain "every day" R. 29, 66. Finally, the ALJ also appropriately relied on William's daily

14

activities as just one of multiple reasons to discount his subjective allegations. Other reasons included diagnostic imaging, physical examination results, testing, and other objective medical evidence. R. 33–34.

This is the ALJ's job, to determine the facts of a particular case and to resolve inconsistencies between a claimant's alleged impairments and his ability to work. See Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996); see also Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984) (finding that because the ALJ had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight). The ALJ's opinion was thorough and applied the proper legal standard, and I will not re-weigh the evidence. Accordingly, I conclude that the ALJ supported his analysis of the subjective complaints with substantial evidence, and that William was capable of performing work at the level stated in the ALJ's opinion during the relevant period.

## CONCLUSION

It is **RECOMMENDED** that an order be entered **AFFIRMING** the final decision of the Commissioner, **GRANTING** summary judgment to the defendant, **DENYING** plaintiff's motion for summary judgment, and **DISMISSING** this case from the court's docket.

The clerk is directed to transmit the record in this case to Michael F. Urbanski, Chief United States District Judge, and to provide copies of this Report and Recommendation to counsel of record. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1)(C) as to factual recitations or findings, as

well as to the conclusion reached by the undersigned, may be construed by any reviewing court as a waiver of such objection, including the waiver of the right to appeal.

                                               Entered:  November 2, 2022

                                               *Robert S. Ballou*

                                               Robert S. Ballou
                                               United States Magistrate Judge